# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 50878

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, June 2025 Term |
| | ) | |
| v. | ) | Opinion filed: December 19, 2025 |
| | ) | |
| TODD MARSHALL FRANDSEN, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County. Rick Carnaroli, District Judge.

The judgment of the district court is <u>affirmed</u>.

Silvey Law Office, Ltd., Boise, for Appellant. Greg S. Silvey argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. John McKinney argued.

_____

MOELLER, Justice.

In 2023, a Bannock County jury convicted Todd Marshall Frandsen of two counts of Lewd Conduct with a Minor under Sixteen. I.C. § 18-1508. He later received two concurrent life sentences, each with 20-year fixed terms. Frandsen appeals, contending that the district court made four errors during his trial. First, Frandsen maintains that the district court erred in denying his request to dismiss a juror on the third day of trial, after the juror remembered that she had attended middle school with one of the victims almost a decade earlier. Second, Frandsen challenges the admission of certain text messages between one of the victims and the victims' mother, arguing that they were irrelevant hearsay containing evidence of uncharged conduct. Third, Frandsen contends that the district court erred in allowing a forensic interviewer, disclosed as a fact witness, to testify as an expert witness for the State of Idaho. Finally, Frandsen argues that he received an excessive sentence. For the reasons stated below, we affirm Frandsen's conviction and sentence.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

In 2021, the State charged Frandsen with three counts of lewd and lascivious conduct with minors under 16 years old, with each charge corresponding to a different victim. To preserve their anonymity, we will refer to the three minor victims in this case, from youngest to oldest, as Child 1, Child 2, and Child 3. The charges stemmed from an investigation of Frandsen after Child 1, Frandsen's then-nine-year-old son, told his mother that Frandsen "tortures" him and engages in lewd conduct with his genitals. Shortly after Child 1 reported this behavior, Child 3, the then 19-year-old half-brother of Child 1, reported similar abuse to law enforcement. Child 3 disclosed allegations of emotional, physical, and sexual abuse by Frandsen when he was approximately 11 to 12 years old. A second half-brother, Child 2, then 17 years old, also submitted to a forensic interview and detailed similar abuse. Child 2 reported additional details of the abuse to detectives amounting to lewd and lascivious conduct, which occurred when he was between the ages of 10 and 12. The allegations made separately by the three brothers shared many details in common. As recounted by the State:

> All three boys described mental abuse in the form of [Frandsen] coming into their rooms at night, growling like an animal, scratching on the walls with his fingernails, and singing a warped version of the nursery rhyme, "Ring Around the Rosies." All three boys also describe sadistic abuse in the form of [Frandsen] pretending [he] was there to kidnap them or murder them. All three boys describe lewd conduct where [Frandsen] would fondle their genitals. And all three victims stated that [Frandsen] told them he would kill them if they told anyone about the abuse.

After he was charged, Frandsen moved to dismiss the complaint for failing to state sufficient facts and a lack of jurisdiction. At the preliminary hearing, the magistrate court denied the motion and Frandsen was bound over to the district court for trial on all three counts. The district court remanded one count back to the magistrate court for "additional findings"; however, Frandsen was eventually bound over on that charge again.

Frandsen's jury trial spanned four days in March 2023. During the State's case-in-chief, Child 3 testified that Frandsen "put his hand underneath my underwear and continued to move his hand up and down." He stated that Frandsen's hand was "wrapped around, like grabbing my penis." Child 2 testified that he "woke up to [Frandsen] grabbing my mouth and my crotch and pulling me into the back corner of the bed where he was at." He further testified that Frandsen "had pressed his genitalia up to my butt and started to essentially, like, slide -- started to slide himself, like, up

and down my butt . . . ." Child 1 also testified that Frandsen "rubbed his face around my genital area."

Whitney Harris, the forensic interviewer who interviewed Child 1, testified concerning her process for conducting forensic interviews with children. Frandsen objected to her testimony, alleging that she was testifying as an expert witness, despite not being disclosed as one. The district court overruled Frandsen's objection and allowed Harris, based on her training and experience, to testify as a fact witness regarding the procedures she used in the forensic interview. Harris went on to testify about the interviews she conducted with Child 1 and was cross-examined by Frandsen.

On the second day of trial, the State notified Frandsen of its intent to seek admission of certain text messages between Child 2 and his mother for rebuttal purposes. Frandsen objected to their admission on the grounds that the messages were irrelevant, consisted of hearsay, and contained evidence of uncharged conduct. He asserted that Idaho Rule of Evidence 404(b) requires the State to provide "reasonable notice" *before* trial if it intended to offer evidence of prior bad acts at trial. The State argued that the text messages were relevant to rebut Frandsen's allegations at trial that the boys' mother had recently conspired with the boys to fabricate the charges against him. Further, the State maintained that the texts did not fit the definition of hearsay because they were not offered for the truth of the matter asserted. The State also asserted that the text messages did not contain evidence of uncharged misconduct, so Rule 404(b)'s notice requirement was not implicated. The district court refrained from making a ruling pending its review of the text messages. After the district court reviewed the text messages, Frandsen renewed his objections on the same grounds. The State then sought to admit the messages during the direct examination of Child 2, and Frandsen objected once again. At that point, the district court overruled Frandsen's objections and admitted the messages.

The next day, Frandsen again objected to the text messages and requested a limiting instruction explaining that the messages were "not . . . offered for the truth of the matter asserted in the text messages, but rather to show that [Child 2 and his mom] had a rocky relationship." The district court agreed, and issued Jury Instruction No. 14, which stated that the messages "were admitted for the limited purpose of showing the relationship between [Child 2] and his mother . . . . The statements made in those text messages are not to be considered as evidence that anything discussed in those text messages actually occurred."

3

On the third day of trial, Juror 16 notified the district court of a potential problem. The court met with Juror 16 in chambers outside the presence of the other jurors. The State and Frandsen were also present. Juror 16 informed the court that, although she did not recognize Child 2's name when it was read during voir dire, she remembered him upon seeing him testify. Only then did Juror 16 recall that she had attended middle school with Child 2 approximately ten years earlier. Juror 16 explained that they "had a couple of classes together," but that they "didn't really talk a lot." In response to questions from the court and the attorneys, Juror 16 stated that she did not know Child 2 very well and had "never talked to him about his family or his home life." She assured the court that she had no opinion or preconceived notion of Child 2, explaining that she "tried to stay pretty unbiased and just focus on the evidence." When asked whether attending school with Child 2 would lead her to believe him over someone else, she responded that she did not think that either side should be concerned with her staying on the jury.

After this colloquy, Frandsen objected to Juror 16 remaining on the jury. The district court again refrained from making an immediate ruling, since there were alternate jurors still available on the jury. At the conclusion of the evidentiary phase of the trial, prior to closing arguments, Frandsen renewed his objection. The district court denied Frandsen's motion, stating that there was "no basis to excuse her for cause at [that] point." Juror 16 remained on the jury and participated in the final deliberations.

Following deliberations, the jury found Frandsen guilty of two lewd conduct charges relating to the older boys: Child 2 and Child 3. However, the jury acquitted him of the charge relating to Child 1. Frandsen moved for a new trial.

The district court sentenced Frandsen to concurrent life sentences with the first 25 years fixed on both counts. After sentencing, the district court took up Frandsen's motion for a new trial and his request to be released pending appeal. The district court announced that it would take both matters under advisement. While those motions were pending, Frandsen filed a motion for reconsideration of his sentence pursuant to Idaho Criminal Rule 35, alleging that it was excessive. The district court later denied Frandsen's motion for a new trial and his request to be released pending appeal. However, the district court granted his Rule 35 motion, reducing the fixed portion of Frandsen's concurrent sentences from 25 years to 20 years for both counts. Frandsen timely appealed to this Court.

## II.     ANALYSIS

On appeal, Frandsen argues that the district court erred in four ways: (1) by denying his request to remove Juror 16; (2) by admitting irrelevant text messages between Child 2 and Child 2's mother that contain hearsay and implicate the notice requirement in Idaho Rule of Evidence 404(b); (3) by allowing Harris to testify as an expert witness for the State even though she was only disclosed as a fact witness; and (4) by imposing an excessive sentence. We will address each argument in turn.

### A.  The district court did not abuse its discretion in denying Frandsen's motion to remove Juror 16.

Frandsen first argues that the district court abused its discretion by denying his motion to remove Juror 16 from the jury for cause. Because Juror 16 remembered, mid-trial, that she went to middle school with one of the victims approximately ten years earlier**,** he maintains that this circumstance alone gives rise to "an inference of bias and a compelling reason to excuse her." Although this might sound like a challenge for implied bias, Frandsen maintains that his objections to Juror 16 remaining on the jury are based on actual bias. Frandsen further notes that because alternate jurors were available, there "was zero reason to retain [Juror 16]." He asserts that "[t]here was absolutely no reason [for the court] not to err on the side of playing it safe and guaranteeing an impartial juror."

"The decision whether a juror can render a fair and impartial verdict is directed to the sound discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Yager*, 139 Idaho 680, 688, 85 P.3d 656, 664 (2004). Under the abuse of discretion standard, this Court reviews whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *State v. Villa-Guzman*, 166 Idaho 382, 384, 458 P.3d 960, 962 (2020) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

A party may challenge a juror for cause during voir dire, or "at a later time as permitted by the court on a showing of good cause." I.C.R. 24(c)(3). "A juror lacks impartiality if actual or implied bias exists, and the Idaho Code provides criminal defendants with the right to strike a biased juror for cause." *Dunlap v. State*, 159 Idaho 280, 304–05, 360 P.3d 289, 313–14 (2015) (quoting *State v. Abdullah*, 158 Idaho 386, 421, 348 P.3d 1, 36 (2015)). Actual bias is "the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which,

in the exercise of a sound discretion on the part of the trier, leads to the inference that he will not act with entire impartiality[.]" I.C. § 19-2019(2). Implied bias, on the other hand, concerns "such a bias as, when the existence of the fact is ascertained, in judgment of law disqualifies the juror[.]" I.C. § 19-2019(1). The referenced "judgment of law" is found in Idaho Code section 19-2020, which specifies nine grounds on which a "challenge for implied bias may be taken." I.C. § 19-2020.

Here, Juror 16 did not recognize the names of any of the alleged victims during voir dire. However, when she saw Child 2 testify, she remembered him from middle school and informed the district court on her own initiative. After the court and the attorneys for both parties questioned Juror 16 about the issue in chambers, she denied any bias or impartiality stemming from her past acquaintance with Child 2, and assured the court that she would not be influenced by her prior knowledge of him. The district court determined no grounds for removing Juror 16 had been established and denied Frandsen's request to remove her from the jury in favor of an alternate juror.

On appeal, Frandsen maintains that Juror 16 possessed actual bias warranting the removal of Juror 16 for cause. Frandsen's argument boils down to his claim that, notwithstanding Juror 16's unequivocal assurance to the district court that she could act impartially, the fact that she knew Child 2 in middle school automatically disqualifies her because it leads "to an inference that she would not act with entire impartiality." Frandsen relies on *State v. Hauser*, 143 Idaho 603, 610, 150 P.3d 296, 303 (Ct. App. 2006), for the proposition that "any justified doubt that a venireman can 'stand indifferent in the cause' ought to be resolved in favor of the accused." Thus, he contends that the district court should have erred on the side of caution and complied with his request to replace Juror 16 with an alternate juror. In furtherance of this point, Frandsen claims that the district court overlooked the fact that Frandsen *would have* objected to Juror 16 during voir dire if he had known she attended school with Child 2.

We conclude that Frandsen has failed to demonstrate any actual bias held by Juror 16. This Court has made it clear that "[a] juror does not have to be disqualified 'if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " *Abdullah*, 158 Idaho at 422, 348 P.3d at 37 (quoting *State v. Hairston*, 133 Idaho 496, 506, 988 P.2d 1170, 1180 (1999)). "Although not always dispositive, the court is entitled to rely on assurances from venire persons concerning partiality or bias." *Hairston*, 133 Idaho at 506, 988

6

P.2d at 1180. Here, Juror 16 assured the district court that she did not harbor any biases based on her limited knowledge of Child 2 while in middle school roughly ten years prior. Because the district court was entitled to rely on Juror 16's statements, we can find no abuse of discretion in its decision to leave her on the jury.

Importantly, a closer examination of Juror 16's statements to the district court strongly support its conclusion that she did not hold any actual bias. When being questioned about her knowledge of Child 2, Juror 16 told the court that she and Child 2 had "only talked a couple of times." They may have had a "couple of classes together," but they never studied together, nor did they ever talk about his "family or home life." Although she thought that Child 2 once gave her his phone number, she "never texted him." None of the allegations, or anything she heard at trial, "r[a]ng a bell" for her. She remembered that he was "very friendly" and "really talkative," but was not otherwise aware of him having any sort of "reputation." Overall, she stated that he was "really just an acquaintance" and that her opinion of him was "pretty neutral." Finally, she noted that she would *not* tend to believe Child 2 over someone else and emphasized that she "tried to stay pretty unbiased and just focus on the evidence."

Frandsen asserts that a trial court "does not have to take the juror's answer" as dispositive of bias, or a lack thereof. While this may be true, Frandsen ignores the fact that a court most certainly *can* take the juror's word on the matter—which is precisely what the district court did here. Furthermore, there is no indication that the court failed to recognize the scope of its discretion or that it somehow believed it was compelled to believe Juror 16. Weighing the truthfulness of a juror's statements is well within a trial court's discretion, and our caselaw makes it clear that the court's exercise of its discretion will not be disturbed when it "(1) correctly perceive[s] the issue as one of discretion; (2) act[s] within the outer boundaries of its discretion; (3) act[s] consistently with the legal standards applicable to the specific choices available to it; and (4) reache[s] its decision by the exercise of reason." *Villa-Guzman*, 166 Idaho at 384, 458 P.3d at 962 (quoting *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194). Here, we conclude that the district court satisfied each of these prongs and appropriately exercised its reasoned discretion when it decided to retain Juror 16.

Frandsen's claim that if his trial counsel had "known in voir dire that Juror 16 knew the victim[,] he would have used a peremptory challenge on her," does not change our analysis. Since Juror 16 unequivocally denied any bias when she disclosed her acquaintance with Child 2 during

7

the trial, it stands to reason she would have also denied it if asked about it during voir dire. Therefore, it is purely after-the-fact conjecture for the defense to now assert that it would have found Juror 16 any more objectionable than the other jurors it removed from the panel merely because of her acquaintance with Child 2 from almost a decade earlier. However, even if this assertion were accepted as true, a party cannot retroactively use a peremptory strike after the jury has been empaneled. *See generally* I.C.R. 24. In sum, it is not relevant under these circumstances whether defense counsel *would have* used a peremptory strike to remove Juror 16 because that is not the standard. Instead, after the jury has been passed for cause and empaneled, a party can only challenge a juror for *good cause with permission of the court*. I.C.R. 24(c)(3).

Frandsen's reliance on *Hauser* is likewise unavailing. In *Hauser*, the Court of Appeals stated: "The greatest certainty that an accused's constitutional right to an impartial jury will be safeguarded is achieved by excusing for cause jurors who, *after admitting bias*, do no more than make equivocal assurances of an effort to be impartial." *Hauser*, 143 Idaho at 610, 150 P.3d at 303 (emphasis added). Under such circumstances, the issue "ought to be resolved in favor of the accused." *Id.* Frandsen contends that *Hauser* governs this case and that the district court should have resolved the issue in his favor by replacing Juror 16 with an alternate juror.

While we continue to endorse the strong recognition of the constitutional right to an impartial jury as an important safeguard of liberty in *Hauser*, Frandsen misapplies its holding to the facts of this case. *Hauser* is distinguishable because it dealt with a juror who explicitly stated that he was biased and refused to unequivocally disclaim that bias. In the case at bar, the exact opposite occurred—Juror 16 unequivocally denied having any bias at all. For this reason, this case does not present the same "justified doubt" regarding Juror 16's impartiality as was manifest by the juror in *Hauser*. *Id*.

In the same way, Frandsen's argument that the district court should have utilized an alternate juror because there "was no reason not to err on the side of playing it safe," is also unavailing. Simply put, while this may be the prudent course at times, it is not the legal standard we apply on review. Rather, the decision is left to the sound discretion of the trial court, and must be based on a finding of bias. *State v. Hall*, 163 Idaho 744, 769–70, 419 P.3d 1042, 1067–68 (2018); s*ee also Hairston*, 133 Idaho at 506, 988 P.2d at 1180 ("The court is entitled to rely on assurances from venire persons concerning partiality or bias."). After questioning Juror 16, the district court

8

determined that she demonstrated no bias and concluded that merely knowing a person from middle school, almost a decade earlier, does not give rise to an inference of bias.[1]

Although Frandsen contends that Juror 16 should have been dismissed for actual bias, as opposed to implied bias, at times he appears to conflate these concepts. Regardless, we conclude that Frandsen has also failed to articulate a viable challenge to Juror 16 for implied bias. Idaho Code section 19-2020 specifies the grounds on which a "challenge for implied bias may be taken," listing nine causes. I.C. § 19-2020. It also clarifies that such a challenge may be taken "*for no other*" cause. *Id.* (emphasis added). Here, Juror 16's situation does not fall within any of the nine grounds specified in Idaho Code section 19-2020. While the statute provides a ground to challenge a juror for implied bias based on a direct familial relationship with the defendant or victim, it does not provide any grounds to challenge a juror simply because she knows the victim from school. *See* I.C. § 19-2020(1). Moreover, "[b]ecause the legislature saw fit to include the language 'and for no other' [this Court] will not extend the statute to situations that are analogous, but not specifically mentioned." *State v. Luke*, 134 Idaho 294, 299, 1 P.3d 795, 800 (2000) (first alteration in original) (quoting *State v. Bowman*, 124 Idaho 936, 42, 866 P.2d 193, 99 (Ct. App. 1993)). Thus, Frandsen has failed to identify proper cause to challenge Juror 16 for implied bias under the Idaho Code. Accordingly, we conclude that the district court did not abuse its discretion in denying Frandsen's request to remove Juror 16 from the jury.

**B. The district court did not abuse its discretion in concluding that the text messages were relevant and admissible for a non-hearsay purpose; however, it erred in part by admitting a portion of the text messages that contained a reference to other bad acts in violation of Idaho Rule of Evidence 404(b).**

Next, Frandsen argues that the district court erred by admitting certain text messages between Child 2 and his mother. These text messages largely consisted of lengthy "tirades" by Child 2 aimed at his mother. According to the State, these messages were offered to rebut the defense's assertions that Child 2 was working in conjunction with his mother to fabricate the charges against Frandsen. At trial, the district court admitted the text messages over Frandsen's objections and gave a limiting instruction. While the text messages were not read to the jury during the trial, they were provided to the jury to read during deliberations.

---

[1] Frandsen also takes issue with the district court's observation that small counties often have small jury pools, leading to a high likelihood that people might have attended school together. We cannot fault the district court for accurately observing this unavoidable fact of life when trying cases in rural Idaho. Importantly, however, the court's observation was merely that—an observation. The record does not support a conclusion that it reached its ruling on this basis.

On appeal, Frandsen raises multiple issues with the text messages, alleging that they: (1) were irrelevant; (2) contained hearsay; and (3) referenced "uncharged bad acts [committed by Frandsen] for which no notice was provided" in violation of Idaho Rule of Evidence 404(b). We will address each argument in turn.

    *1.   The text messages were relevant.*

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." I.R.E. 401. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" I.R.E. 403. "Whether evidence is relevant is reviewed de novo; however, the decision to admit or exclude evidence under another rule is generally reviewed for an abuse of discretion." *Stephens v. Buell*, ___ Idaho ___, ___, 568 P.3d 471, 490 (2025) (citing *Martinez v. Carretero*, 173 Idaho 87, 97, 539 P.3d 565, 575 (2023)).

In his opening statement at trial, and throughout his cross-examination of Child 2, Frandsen attempted to demonstrate the possibility that Child 2's mother had conspired with Child 2 to fabricate the charges against him. In response, the State sought to admit the disputed text messages to undermine this theory by showing that Child 2 harbored animosity towards his mother and even blamed her for his abuse at the hands of Frandsen. While the text messages are lengthy, the following excerpt, sent from Child 2 to his mother, provides a representative example:

> This is going to be my [one] and only communication with you for the next few months. I'm coming down next weekend to grab some of my stuff that I left at the house and at my old apartment... I'm done talking to/or seeing you after that. You act like you care and say all these nice things but in reality you don't. . . . Your [sic] clearly not struggling as bad as we are. You feel no guilt or shame for not offering to pay for everything and anything you can to help with my mental health when YOU played a role with my problem in the first place!!!! YOU CHOSE to stay married to [Frandsen] even after we had begged and pleaded for you to divorce him several times!!!

Frandsen objected to the text messages at trial, arguing that they were, among other things, irrelevant. Frandsen also raised these same objections in his motion for a new trial.

We conclude that the text messages were logically relevant under Rule 401 because they are (1) probative of a fact of consequence—whether the victim's story had been fabricated in concert with his mother—and (2) they tend to make it less probable that this occurred. The text messages showed that Child 2 was angry with his mother, as evidenced by the heated tone of the texts. The text messages support the State's position that Child 2 would have been unlikely to

cooperate with his mother in fabricating these charges against his stepfather. As the district court noted, the messages "tend[ed] to show that it [was] *at least less probable* that [the fabrication] occurred." (Emphasis added). Frandsen does not dispute that a fact establishing whether the charges were fabricated would be a fact of consequence. Therefore, because the text messages tend to make the possibility of fabrication less probable, they are relevant under Rule 401.

Frandsen argues that the messages are not relevant because it was "just as likely (or more likely) that [Child 2]'s poor relationship and attitude shown in the texts was caused by him being drug [sic] into his mother's scheme and having to fabricate allegations." However, this argument only goes to the weight and interpretation of the evidence, not its admissibility. Even under Frandsen's proffered interpretation of their meaning, the text messages would still satisfy Rule 401's requirement of making a fact of consequence "more or less probable than it would be without the evidence[.]" Importantly, nothing prevented Frandsen, during cross examination and in his closing arguments, from suggesting to the jury that his interpretation of the evidence made more sense than the State's view.

For these reasons, based on our de novo review of the evidence, we conclude that the district court did not err in concluding that the text messages were relevant under Idaho Rule of Evidence 401.

2. *The text messages were not hearsay.*

Next, Frandsen argues that the district court abused its discretion in admitting the text messages because they contained inadmissible hearsay. Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." I.R.E. 801(c). A "statement" includes "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." I.R.E. 801(a). Additionally, "[h]earsay is not admissible unless specifically provided for in the Rules of Evidence." *State v. Joy*, 155 Idaho 1, 13, 304 P.3d 276, 288 (2013) (citing I.R.E. 802). When reviewing a "judgment call made by the district court as to whether [evidence] should have been admitted for a non-hearsay purpose," we apply an abuse of discretion standard. *State v. Roman-Lopez*, 171 Idaho 585, 593, 524 P.3d 864, 872 (2023).

As noted above, the district court overruled Frandsen's hearsay objections at trial. When denying Frandsen's later motion for a new trial, the district court further explained its reasoning and noted that it overruled Frandsen's hearsay objection for two reasons. First, the district court

11

found that the messages were not hearsay because they were not offered for the truth of the matter asserted. *See* I.R.E. 801(c). Second, the district court found that the messages were not hearsay under Rule 801(d)(1)(B)(i), as the messages were offered to rebut an express or implied charge against Child 2 that he (1) recently fabricated the story or (2) was acting pursuant to an improper influence or motive.

We conclude that the district court was correct in its first finding: the text messages were not offered for the truth of the matter asserted. The State expressly offered the text messages for the sole purpose of rebutting the defense's fabrication theory by demonstrating that the relationship between Child 2 and his mother was strained or hostile. There was no reason to conclude that the State was trying to prove that Child 2's mother no longer supported him financially, or that she "care[d] more about having fun with [Child 1]" than with Child 2, or even that Child 2 had asked her to divorce Frandsen in the past. Instead, the State was offering the text messages for the sole purpose of dispelling the suggestion that Child 2 and his mother had worked together to fabricate allegations against Frandsen. This is allowable under Rule 801(c).

For these reasons we conclude that the district court properly ruled that the text messages were not admitted for the truth of the matter asserted. Indeed, at Frandsen's request, the district court later gave a limiting instruction to the jury, Jury Instruction No. 14, which stated that the "statements made in those text messages are not to be considered as evidence that anything discussed in those text messages actually occurred." Again, this Court will not overturn a trial court's determination that evidence is offered for a non-hearsay purpose absent an abuse of discretion. *Roman-Lopez*, 171 Idaho at 593, 524 P.3d at 872; *see also State v. Pepcorn*, 152 Idaho 678, 690, 273 P.3d 1271, 1283 (2012) ("We presume that the jury followed the jury instructions given by the trial court in reaching its verdict."). (citation modified) (quoting *State v. Carson*, 151 Idaho 713, 718, 264 P.3d 54, 59 (2011))).

We note that in his opening brief on appeal, Frandsen did not address the district court's conclusion that the messages were not offered for the truth of the matter asserted, nor did he attempt to demonstrate how the court abused its discretion in admitting the evidence on this basis. Instead, Frandsen solely focuses on the district court's alternate finding under Rule 801(d)(1)(B)(i), which states that "an out-of-court statement consistent with the declarant's trial testimony, 'offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive,' is not hearsay." *Joy*, 155 Idaho at 13, 304 P.3d at 288 (quoting

12

I.R.E. 801(d)(1)(B)(1)). This Court has clarified that this rule "only permits introduction of out-of-court statements that were made prior to the time when the declarant would have a motive to lie." *Id.* at 14, 304 P.3d at 289. Here, because "all of the texts post-dated the time that [Child 2] (and his mother) had a motivation to lie[,]" Frandsen contends that the messages are inadmissible under Rule 801(d)(1).

The State acknowledges that the district court's reliance on Rule 801(d)(1) was mistaken and we agree. The hearsay exception in Rule 801(d)(1) did not apply to these text messages because the text messages post-dated the time when Child 2 would have motive to lie. However, this does not alter the fact that this was the court's alternate basis for admitting the text messages. The court's primary basis for admitting the text messages was that they were not hearsay because they were not offered for "the truth of the matter asserted." I.R.E. 801(c)(2). Not all evidence offered to rebut a charge of fabrication is required to be admitted pursuant to Rule 801(d)(1). That rule simply provides that such evidence, under certain circumstances, is *not hearsay*. I.R.E. 801(d)(1). If evidence does not meet the definition of hearsay in the first instance, then there is no need to rely on Rule 801(d)(1) for it to be admitted. Therefore, because the text messages were not hearsay under Rule 801(c)(2), the State did not need to rely on Rule 801(d)(1) for their proper admission.

In conclusion, although the district court may have erred in its alternative finding that the text messages were not hearsay under Rule 801(d)(1), this does not affect the court's initial conclusion that the text messages were not hearsay for another reason. Here, the district court correctly determined that the text messages were not hearsay, as they were admissible under Rule 801(c) for a non-hearsay purpose. "Where a lower court makes a ruling based on two alternative grounds and only one of those grounds is challenged on appeal, the appellate court must affirm on the uncontested basis." *Morrison v. St. Luke's Reg'l Med. Ctr., Ltd.*, 160 Idaho 599, 609, 377 P.3d 1062, 1072 (2016) (citation omitted). Accordingly, we affirm the district court's determination that the text messages were not hearsay.

> 3. *The district court erred in admitting portions of the text messages referring to uncharged bad acts under Rule 404(b); however, this error was harmless.*

Frandsen next contends that the text messages contained improper evidence of other crimes or bad acts. Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to show a defendant's criminal propensity." *State v. Sheldon*, 145 Idaho 225, 227-28, 178 P.3d 28, 30-31 (2008). However, evidence of "a crime, wrong, or other act" can be admissible at trial for other,

non-propensity purposes. *See* I.R.E. 404(b)(2). "Admissibility of evidence of other crimes, wrongs, or acts when offered for a permitted purpose is subject to a two-tiered analysis." *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009). First, there must be sufficient evidence to establish the other crime or wrong as a fact, and second, "the trial court must engage in a balancing under [Idaho Rule of Evidence] 403 and determine whether the danger of unfair prejudice substantially outweighs the probative value of the evidence." *Id.* Additionally, to admit such evidence in a criminal trial, a prosecutor must "file and serve reasonable notice of the general nature of any such evidence" in advance of trial, or give notice "during trial if the court, for good cause shown, excuses lack of pretrial notice." I.R.E. 404(b)(2). This Court has held "that compliance with Rule 404(b) is mandatory and a condition precedent to admission of other acts evidence." *Sheldon*, 145 Idaho at 230, 178 P.3d at 33. "We review a trial court's decision to admit evidence for abuse of discretion." *Grist*, 147 Idaho at 51, 205 P.3d at 1187.

Frandsen asserts that the text messages necessarily invoked Rule 404(b) because they contained evidence of "other bad acts," and the State did not provide advance notice in accordance with Rule 404(b). Specifically, Frandsen takes issue with the following language contained in the long string of text messages from Child 2 to his mother:

> I had tried throughout my childhood to tell you guys that he was scaring me in my sleep and was tormenting me but you never listened! And now I'm having to deal with constant horrible flashbacks *of him raping me and hitting me* and you don't feel any obligation to pay for that hospital bill or even my gas (which is all I originally asked for from you) but that was too much for you. Any Mother would do everything in their power to try to help their child during tuff [sic] times let alone something as severe as this which YOU (whether intentionally or unintentionally) enabled to happen to me for 7 Fucking years!!! I don't want to be your son anymore. . . . . Do you have any clue what it feels like to know that your [sic] so much less of a man . . . So incredibly pathetic that you were *raped and beat* [sic] *by your step father*[?]

(Emphasis added). Frandsen asserts that "[t]he incendiary and highly prejudicial term rape should not have been exposed to the jury since it was not, and could not have been, charged under these facts." Frandsen asserts that, "[w]hile perhaps every child rape can be charged as lewd conduct, not every lewd conduct can be charged as a rape." Thus, Frandsen argues that the allegation of rape amounts to evidence of another uncharged bad act. He also argues that the mention of him "hitting" and "beat[ing]" Child 2 is likewise evidence of an uncharged bad act, because the State never charged him with battery.

14

As explained above, the district court overruled Frandsen's objection to the text messages at trial. In its later ruling on his motion for a new trial, the district court concluded that the mention of "rape" in the text messages did not fall within the scope of Rule 404(b) because they did not present evidence of "other bad acts." It found that "the conduct that was discussed in the text messages related to the charged conduct of sexual abuse" and, thus, did not refer to any "other" bad acts. The court further explained:

> [Frandsen] believes that [the characterization of his conduct as "rape"] far exceeds what he was charged with, but that is simply not accurate. [Frandsen] was charged with Lewd and Lascivious Conduct with a Child under 16. This statute prohibits everything from manual fondling of a child up to, and including, sexual penetration. The act of rape does not exceed his charge.

There is no dispute that the text messages were not offered to prove Frandsen's "character in order to show that on a particular occasion the person acted in accordance with the character." I.R.E. 404(b)(1). It is also undisputed that the State did not give Frandsen advance notice of its intent to admit 404(b) evidence relating to Frandsen separately raping or beating Child 2 as another bad act. Thus, the question on appeal is whether Child 2's reference to being "raped" and "beaten" amounted to evidence of other bad acts under Rule 404(b). If they did, then the State needed to comply with the notice requirement; if not, then the district court did not err in admitting the text messages.

Initially, we note that Frandsen properly preserved this issue for appeal. The State asserts that Frandsen "never objected when [Child 2] testified during direct examination about the physical and psychological abuse that Frandsen enacted upon him." The State points out that it filed a pre-trial motion seeking to admit certain 404(b) evidence relating to physical and psychological abuse, which the district court granted. Thus, it argues that references to Child 2 being hit or beaten were properly noticed and permissible under Rule 404(b). However, the district court's order only granted the 404(b) motion as it related to "evidence of the song [Frandsen would sing], of scratching on the walls and [Frandsen] speaking in a demonic voice." Contrary to the State's assertion, the district court's initial ruling did not allow the State to introduce *any* evidence that fell into the category of physical or psychological abuse. Importantly, Frandsen made timely objections to the text messages on Rule 404(b) grounds when the State again sought to introduce them as evidence. The fact that Frandsen did not object to Child 2's direct testimony to the effect that he was "physically abused," does not mean that Frandsen failed to preserve his objection to a separate and discrete issue of whether the text messages contained Rule 404(b) evidence for which

the State failed to provide notice. For these reasons, we determine that the issue was properly preserved and will address it.

i. <u>The reference to Child 2 being "raped" was not evidence of "other bad acts."</u>

We agree with the district court that the reference to "rape" in the text messages did not amount to evidence of any additional bad act beyond what had been charged. As the district court aptly explained, "the conduct that was discussed in the text messages related to the charged conduct of sexual abuse." In other words, the text messages referred to the *same* conduct being charged, not any *other* bad act. Frandsen was charged with lewd conduct against Child 2, and that is what Child 2 was referring to in his text messages. The fact that Child 2, who was still a minor, colloquially described those same acts of sexual abuse as "rape" instead of "lewd conduct" does not transform the messages into evidence of other distinct bad acts. In sum, this was not evidence of *other bad acts,* it was merely a *different characterization of the same acts*.

To hold otherwise would be akin to excluding a victim's trial testimony where they simply referred to the charged conduct under a different legal name. For example, if a defendant was charged with battery, and the victim characterized the incident as being "assaulted," this would not automatically become Rule 404(b) evidence. Instead, it would very much be a factual question and highly dependent on context. In this case, we conclude that the district court did not err in concluding that the reference to "rape" in the text messages was not an assertion of any other bad act; rather, it referred to the same general conduct under a different name. Moreover, it has not been persuasively argued that the jury would have been confused on this point and mistakenly concluded that Child 2 was referencing a separate and distinct act of rape.

The wording of the charges brought against Frandsen bear out this conclusion. Frandsen was charged with multiple counts of lewd and lascivious conduct, including "genital to genital . . . contact" with Child 2 and "pressing his genitals to the genitals or anus of the minor." As the State points out, this conduct could include penetration, as is required to prove a charge of rape. Of course, Frandsen is also correct that not all lewd conduct fits the definition of rape. However, Frandsen cannot point to anything in the record suggesting that the reference to rape in the text messages was describing a different crime, wrong, or act other than the lewd conduct with which he was charged. Furthermore, we also note that Rule 404(b) is inapplicable to other offenses committed during the same transaction or criminal episode. *See Sheldon*, 145 Idaho at 228, 178 P.3d at 31 (noting that Rule 404(b) does not apply to evidence of another act which, along with the

16

crime charged, are a "part of a single criminal episode"); *United States v. Aleman*, 592 F.2d 881, 885 (5th Cir.1979) ("The policies underlying [Rule 404(b)] are simply inapplicable when some offenses committed in a single criminal episode become 'other acts' because the defendant is indicted for less than all of his actions.").

Because the text messages referred to essentially the same conduct that formed the basis of the charges against Frandsen, and it does not appear that the reference to rape conveys information that an additional crime was committed, it was not an improper reference to a separate and discrete bad act. Consequently, we conclude that the district court did not err in concluding that the references to rape were not evidence of any other bad acts for which the State needed to provide advance notice.

ii.     The references to Child 2 being "hit" and "beaten" were evidence of other bad acts for which Frandsen did not receive notice.

While we conclude that the reference to rape in the text messages was not evidence of other bad acts, we reach a different conclusion regarding the references to Child 2 being "hit[]" and "beat[en]" by Frandsen. While Child 2's statement about being "raped" reasonably referred to the charged conduct, Frandsen was not charged with any conduct relating to physically beating Child 2. Although we recognize that there may be a certain degree of overlapping abuse inferred in a lewd conduct charge, the physical abuse alleged in the text message was specific and appears to be separate from the behavior alleged in the lewd conduct charges. On its face, the allegations of beating or hitting indicate that they were separate and distinct "bad acts." As a result, the text messages referring to Child 2 being hit or beaten constitute Rule 404(b) evidence for which the State did not provide advance notice. These references should have been redacted before the text messages were published to the jury.

The State points out that Frandsen did not request or propose any redactions to the text messages, even though the district court informed the parties that it would redact certain portions of the text messages prior to their admission. The State contends that Frandsen's failure to request these redactions places the blame on him, such that he cannot now complain about the contents of the text messages on appeal. However, the State's argument is mistaken. The proponent of the evidence bears the burden of ensuring its admissibility. Frandsen timely objected to the text messages, explicitly asserting his prior bad acts argument. Therefore, since Frandsen was not given timely notice under Rule 404(b), it was not incumbent on him, in the middle of a trial, to propose redactions to the proposed exhibit in order to render it admissible—the State should have moved

17

to admit a properly redacted version. Put simply, under these circumstances, it was not Frandsen's duty to fix the State's evidence so that it could be properly admitted against him. If the State wanted to admit the evidence, it should have either redacted it further or provided notice in compliance with Rule 404(b)(2).[2]

In sum, we conclude that the text messages contained evidence of other bad acts, insofar as they referenced Child 2 being hit and beaten by Frandsen. Because the State did not give Frandsen advance notice of its intent to introduce such evidence in accordance with Rule 404(b), and failed to redact the improper references, the district court erred in admitting the text messages. Additionally, the district court failed to recognize that evidence implicating Rule 404(b) required further analysis, including applying the balancing test under Rule 403 to "determine whether the danger of unfair prejudice substantially outweighs the probative value of the evidence." *Grist*, 147 Idaho at 52, 205 P.3d at 1188.

### iii.     The error was harmless.

While the district court erred in allowing the references to Child 2 being hit and beaten to be published to the jury, we conclude that the error was harmless. "Harmless error is error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record." *State v. Garcia*, 166 Idaho 661, 674, 462 P.3d 1125, 1138 (2020) (citation modified). This standard "requires weighing the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error." *Id.*

Here, the probative force of the disputed references in the text messages is minimal. First, the text messages were not offered to prove Frandsen's "character in order to show that on a particular occasion [he] acted in accordance with the character." I.R.E. 404(b)(1). Instead, it was offered for "another purpose," i.e., to show the hostility in Child 2's relationship with his mother. In fact, the jury was specifically instructed that it could only consider this evidence for that narrow purpose. In light of this limiting instruction, the references to Child 2 being hit or beaten did not present the typical dangers associated with 404(b) evidence.[3]

---

[2] Indeed, we note that this issue could have been entirely avoided with more carefully fashioned redactions.
[3] We acknowledge that the district court did not conduct a Rule 403 balancing test of the evidence, as it failed to recognize the evidence as falling under Rule 404(b). However, at worst, the failure to conduct this analysis resulted in the same harm to Frandsen: the evidence being erroneously admitted. Because the harmless error test requires us to weigh the record as a whole, excluding the erroneous evidence, and compare it against the probative force of the error, our analysis does not change in this regard. Moreover, we note that while the prejudicial effect of the text messages

18

When this error is viewed in the context of the entire trial, we conclude that it is extremely unlikely that the jury convicted Frandsen of two counts of lewd conduct just because there were brief, nonspecific allegations of him hitting and beating one of the victims. Clearly, the evidence was offered to rebut other evidence presented by Frandsen at trial. The brief reference in the text messages to Child 2 being hit or beaten were made in passing and are not the focus of the text messages. The State only asked Child 2 basic foundational questions regarding the text messages; it did not question him about the content of the messages. In fact, none of the messages were read aloud to the jury; instead, the messages were simply given to the jury as an exhibit. Moreover, Frandsen had ample opportunity to cross-examine Child 2 on this subject. As noted above, the jury was instructed by the district court not to consider the text messages for the truth of any matter asserted. *See State v. Pepcorn*, 152 Idaho 678, 690, 273 P.3d 1271, 1283 (2012) (stating that courts will "presume that the jury followed the jury instructions given by the trial court in reaching its verdict"). For all these reasons, we conclude that "the probative force of the error" was minimal. *Garcia*, 166 Idaho at 674, 462 P.3d at 1138.

In contrast, there was substantial and weighty evidence supporting Frandsen's guilt presented at trial. Most prominently, Child 2 testified at length and in great detail about Frandsen's acts constituting lewd conduct. For example, Child 2 testified that Frandsen forcibly grabbed him, and "he had pressed his genitalia up to my butt and started to essentially, like, slide -- started to slide himself, like, up and down my butt." Child 2 testified that he could feel Frandsen's "penis and balls sliding up and down against my butt . . . ." He "woke up to [Frandsen] grabbing my mouth and my crotch and pulling me into the back corner of the bed where he was at." After Child 2 tried to get away, Frandsen got on top of him; he further testified that Frandsen then "started moving his hand up my leg towards my underwear." Child 2 stated that when he "tried getting out of the bed," Frandsen "had grabbed me and pulled me into him." Child 3 testified that Frandsen "put his hand underneath my underwear and continued to move his hand up and down." He stated that Frandsen's hand was "wrapped around, like grabbing my penis."

This testimony was the heart of the State's case. A review of the trial record makes it clear that the State was not attempting to convince the jury that Frandsen was guilty of lewd acts by suggesting that he had a propensity to hit or beat the boys. Rather, the State put on considerable

---

was minimal for the same reasons explained in this section, the probative value of this evidence to demonstrate the absence of fabricated testimony was considerable.

evidence towards its theory of the case—that Frandsen used frightening and coercive means to terrorize the children so that they would submit to the lewd acts he committed against them. When the probative force of the evidence of lewd conduct contained in the record as a whole is contrasted against the brief reference to hitting and beating in the text messages, we conclude that "the error did not contribute to the verdict rendered" and was "unimportant in relation to everything else the jury considered on the issue in question[.]" *Garcia*, 166 Idaho at 674, 462 P.3d at 1138 (citation omitted). Accordingly, we conclude that any error in admitting the text messages was harmless.

**C. Although the district court abused its discretion in allowing the forensic interviewer, while testifying as a fact witness, to answer additional questions that touched on expert testimony, we conclude that the error was harmless.**

Next, Frandsen asserts that the district court abused its discretion in allowing the forensic interviewer, while testifying as a lay witness, to testify concerning the scientific basis for the procedures she follows in interviewing young victims and discussing how to determine whether a child is accessing a memory when answering a question, or simply repeating a story that someone else told him. Frandsen argues that in answering certain questions regarding her work, training, and why she follows certain procedures, the forensic interviewer took on the role of an expert witness, which was improper because she was not properly disclosed as an expert by the State.

The State listed Whitney Harris, the clinical director and forensic interviewer at Bright Tomorrows Child Advocacy Center, as a lay witness. At the pretrial conference, Frandsen objected to Harris as a witness if she was going to be testifying as an expert, as the State did not disclose her as one. Frandsen requested that Harris' testimony be limited to that of a lay witness; the State confirmed that it was offering Harris as a fact witness, not as an expert. The State stated that, although Harris had "done over 600" forensic interviews as a part of her "training and experience," this fact did not "make her an expert" for the purposes of her testimony in the present trial.

During her trial testimony, Harris explained her training and experience, noting that she had a master's degree in counseling, a clinical license, gone through multiple forensic-interview trainings, and conducted close to 700 forensic interviews. When Harris was explaining what her job entailed as a forensic interviewer, the following exchange occurred:

[State:] Okay. When you're doing these interviews -- sorry. When you're doing these interviews, do you typically ask a child how many times something has happened?

[Harris:] We do not. *Research has shown* that kids are not really accurate.

20

(Emphasis added). At this point, Frandsen objected, arguing that Harris was testifying as an expert witness. After the State clarified that she was only testifying as a fact witness, the district court asked Harris if she intended to offer any opinion testimony. Harris responded by saying, "No." The district court subsequently overruled Frandsen's objection because "the research [Harris was] talking about" was not "leading to an opinion." Instead, it was only "to explain what [Harris] do[es]."

Harris went on to explain the research underlying the model that forensic interviewers employ when interviewing children. For example, Harris explained why she does not ask children if something happened to them multiple times.

| [State:] | Okay. So how come you don't ask a child how many times something happened? |
|---|---|
| [Harris:] | So our interview model does not have us ask how many times. It asks if something has happened to a child one time or more than one time. And the people that had developed the interview model did it that way because *the research shows* that kids don't do a great job of accurately estimating how many times something's happened. |

(Emphasis added).

Harris testified that she interviewed Child 1 twice. The State asked if it was common to interview a child twice. Harris stated that it was not out of the ordinary, but did not happen often. When asked, Harris explained the reason that they conducted second interviews:

| [State:] | And what's the reason to do a second interview? |
|---|---|
| [Harris:] | The reason that we'll sometimes do second interviews is because children will come in—with sexual abuse in particular but any kind of trauma, kids will often tell—they'll disclose information bit by bit. They'll give pieces of the information. And so sometimes after the interview's over, they'll continue to talk about more things that have happened, and so we'll have the child come back in and explain about any additional disclosures that happened following the interview. |
| [State:] | Okay. When you're doing these interviews with a child, are there certain things that you -- are there certain things that you look for that seems to you -- as an interviewer who's done almost 700 interviews, are there certain things that you look for that indicate to you that a child is accessing their memory? |
| [Harris:] | Yes. |
| [Frandsen:] | Objection if we're getting into opinion after this. |

| [State:] | Your Honor, I believe that this is based on training and experience, so I still believe it goes under a fact witness as her job description. |
|---|---|
| [Court:] | Overruled at this point. |

Harris went on to testify about the things she looks for when interviewing children, as it related to their memory. Frandsen did not object again during this testimony. Importantly, Harris offered no opinions and the only interview Harris substantively testified about was her interview with Child 1, even though she also interviewed Child 2.

Beyond the objections raised during Harris' testimony, Frandsen also argued in his motion for a new trial that Harris testified as a non-disclosed expert witness. In its order denying the motion, the district court explained that Harris did not testify as an expert because her testimony "was limited to inferences based on her rational perception." The district court explained that, while Harris had provided information about her background, "the State elicited absolutely no opinion testimony from her." The court also noted that Harris' limited mention of Child 2 and Child 3 was "actually elicited by Frandsen's counsel on cross-examination." The court concluded that even if it was an error, it was an invited one. Finally, the district court noted that the jury was instructed to decide each count separately, uninfluenced by decisions on the other counts. Since the jury acquitted Frandsen on the charge related to Child 1, the court could not "conclude that the jury used any testimony of [Harris] about [Child 1's] interview in convicting [Frandsen] on the other two charges."

On appeal, Frandsen raises two main arguments. First, he contends that Harris' testimony was based upon specialized knowledge or training, making her an expert witness who was not properly disclosed by the State. Second, Frandsen asserts that, although Harris' testimony was largely limited to Child 1, it affected his convictions relating to Child 2 and Child 3.

Idaho Rule of Evidence 702 defines an expert witness and sets forth the parameters for offering an opinion as testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

I.R.E. 702. On the other hand, Rule 701 sets forth the definition for lay witness testimony when it includes an opinion or inference:

> If a witness is not testifying as an expert, testimony in the form of an opinion or inference is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

I.R.E. 701. Additionally, Idaho Criminal Rule 16(b)(7) requires the State to disclose, on written request of the defendant, "a written summary or report of any" expert testimony it intends to introduce at trial. I.C.R. 16(b)(7).

These rules contemplate certain distinctions among witnesses, some of which are particularly relevant here. First, there is a distinction between a lay witness who testifies to *facts* they observed and an expert witness who gives *opinion* testimony based on their specialized knowledge. "A fact witness typically testifies about information the witness has acquired independent of the litigation, the parties, or the attorneys by stating the witness's recollection of past events." 31A Am. Jur. 2D *Expert and Opinion Evidence* § 4 (2024). Opinion testimony, on the other hand, "draws from the given facts to reach a conclusion that cannot be tested directly and concerns what a witness thinks, believes, or infers in regard to the facts in dispute, as distinguished from the witness's personal knowledge of the facts themselves." *Id.*

Next, there is a difference between lay opinion testimony and expert opinion testimony. "Lay opinion testimony 'results from a process of reasoning familiar in everyday life,' while expert opinion testimony 'results from a process of reasoning which can be mastered only by specialists in the field.' " *State v. Smith*, 170 Idaho 800, 817, 516 P.3d 1071, 1088 (2022) (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment). Opinion testimony is that of an expert when it is "wholly scientific or so far removed from the common knowledge and experience of the average person that expert knowledge is essential to the formation of an intelligent opinion[.]" *Id.* (citation modified).

Here, Harris gave a detailed explanation of her training and education. She also described at length the things that she looks for when interviewing children to determine whether they are accessing their own memories rather than merely "regurgitating information" they have been told to say. Essentially, she described how she conducts interviews with children in order to detect their truthfulness. For example, Harris stated:

When children are able to describe sensory details, that's something we look for. So I'll ask them, "What did your body feel? What did you see? What did you

hear? You know, what could you smell? What did that taste like?" Those kind of things.

. . . .

The other thing that I notice a lot in forensic interviews is when children will just kind of spontaneously describe what we would consider trauma symptoms. So they'll oftentimes talk about freezing up. That's a really common one with sexual abuse.

We note that this is a close call, and this issue could have been avoided had the State simply listed Harris as an expert witness. Harris properly testified as a fact witness when she described her job and discussed how she conducts her interviews. She did not offer any opinions on whether "abuse occurred, whether [Frandsen] was the abuser, or whether the victims' stories about abuse were fabricated." Moreover, she did not opine as to whether Child 1 was telling the truth or was credible. Instead, Harris merely recounted her rational observations of Child 1 during the interview. *See* 1 *McCormick on Evidence* § 11 (8th ed. 2022). Nevertheless, Harris did venture into the realm of an expert witness when she testified about what "the research shows" and the scientific basis for why she asks questions in a certain manner. This is precisely the type of "scientific, technical, or other specialized knowledge" that implicates Idaho Rule of Evidence 702. Therefore, the State should have disclosed her as an expert beforehand if they intended to illicit such testimony at trial.

Notwithstanding this analysis, we conclude that any error in allowing Harris to testify on the matters specified above as an expert witness, despite her non-disclosure as such, was harmless. First, Harris testified almost exclusively about her interview with Child 1, yet the jury acquitted Frandsen of that charge. Thus, the admission of her testimony was harmless because it clearly did not sway the jury as to the count she testified concerning. Second, even though a portion of Harris' testimony was improper, the prejudice Frandsen would have suffered is minimal and harmless considering the substantial evidence supporting his convictions as to Child 2 and Child 3. As the district court noted, Harris' testimony had little to do with the two other charges for which Frandsen was convicted. Third, the only time Harris even mentioned Child 2 or Child 3, it was elicited by Frandsen's own cross-examination. As a result, we agree with the district court's conclusion that any effect Harris' testimony had vis-à-vis Child 2 or Child 3 was precipitated by Frandsen. Therefore, any error affecting the two counts for which he was convicted would have been invited. "The doctrine of invited error applies to estop a party from asserting an error when [the party's] own conduct induces the commission of the error." *City of Middleton v. Coleman Homes, LLC*,

163 Idaho 716, 727, 418 P.3d 1225, 1236 (2018) (alteration in original) (quoting *Thomson v. Olsen*, 147 Idaho 99, 106-07, 205 P3d 1235, 1242-43 (2009)).

Accordingly, we conclude that although the district court erred in allowing Harris to testify as a fact witness concerning the research and science supporting her work, the error was harmless.

**D. Frandsen has not demonstrated cumulative error.**

Frandsen argues that, even if each asserted trial error is not enough alone to constitute reversible error, the cumulative impact of these errors taken all together warrants a new trial. "Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *State v. Perry*, 150 Idaho 209, 230, 245 P.3d 961, 982 (2010). "However, a necessary predicate to the application of the doctrine is a finding of more than one error." *Id.* Here, Frandsen has demonstrated two errors, both of which we determined to be harmless when reviewed separately. Considering these errors in concert, we still cannot conclude that these errors demonstrate that Frandsen was denied a fair trial. *Id.*

First, although the lengthy text messages contained a single reference to "being hit or beat[en]," which should have been redacted, this evidence was subject to a limiting instruction. The jury was instructed that the text messages were not to be considered for the truth of any matter asserted by the State—they were only offered to rebut other evidence presented by Frandsen at trial suggesting the witness was acting in concert with his mother. The reference to being hit or beaten was not read aloud to the jury or highlighted by the State at any point of the trial. Frandsen did not even cross-examine Child 2 on this subject. As we noted above, the probative force of the disputed reference in the text messages was minimal. Second, as noted immediately above, the forensic interviewer's testimony that ventured into the realm of expert testimony clearly had no effect on the jury because the jury acquitted Frandsen of the charge concerning Child 1 about whom the witness testified.

Reviewed in the aggregate, we are convinced that these two errors do not rise to a level where we can conclude that Frandsen was denied a fair trial. Importantly, "[a] defendant is entitled to a fair trial, but not a perfect trial." *State v. Enno*, 119 Idaho 392, 408, 807 P.2d 610, 626 (1991) (first citing *Bruton v. United States*, 391 U.S. 123, 135 (1968); and then citing *State v. Estes*, 111 Idaho 423, 428, 725 P.2d 128, 133 (1986)). Having carefully reviewed the record, we conclude that there was substantial evidence supporting Frandsen's convictions as to Child 2 and Child 3. Taken together, the erroneously admitted evidence did not support the State's theory of the case as

to either child. Importantly, *each* error at issue did not cumulatively affect Frandsen's conviction as to any one victim because, in each instance, the disputed evidence was only relevant to a *single* victim—i.e., the text message only concerned Child 2, and the improper expert testimony only concerned Child 1. Therefore, it is highly unlikely there was any cumulative error or aggregate effect as to either charge, especially since Frandsen was ultimately acquitted of the charges related to Child 1. Accordingly, we conclude that Frandsen received a fair trial.

### E. The district court did not abuse its discretion in sentencing Frandsen to concurrent life sentences with 20 years fixed.

Finally, Frandsen challenges his sentence as being excessive. The district court originally sentenced Frandsen to two concurrent sentences of life in prison with 25 years fixed. After a hearing on an Idaho Criminal Rule 35 motion filed by Frandsen, the district court reduced each fixed sentence by five years, resulting in concurrent life sentences with 20 years fixed. On appeal, Frandsen contends that the district court erred in imposing both the original and reduced sentence, arguing that the sentences were excessive.

Initially, we note that Frandsen's original sentences of 25 years to life are no longer in effect because they were modified when the district court amended his sentences pursuant to Rule 35. This renders Frandsen's challenge to his original sentences moot. *See Edmondson v. Finco*, 172 Idaho 421, 424, 533 P.3d 1012, 1015 (2023) ("An issue is moot if it presents no justiciable controversy and a judicial determination will have no practical effect upon the outcome.") (quoting *Frantz v. Osborn*, 167 Idaho 176, 180, 468 P.3d 306, 310 (2020))). Thus, Frandsen can only properly challenge the amended sentences he received—life in prison with 20 years fixed.

"Challenges to a sentence are reviewed under an abuse of discretion standard." *State v. Chavez*, 174 Idaho 745, 759, 560 P.3d 488, 502 (2024). "A sentence fixed within the limits prescribed by the statute will ordinarily not be considered an abuse of discretion by the trial court." *State v. Anderson*, 172 Idaho 133, 530 P.3d 680, 690 (2023) (citation modified). "To show an abuse of discretion, the defendant must show that in light of the governing criteria, the sentence was excessive, considering any view of the facts." *State v. McIntosh*, 160 Idaho 1, 8, 368 P.3d 621, 628 (2016). "This Court will set aside the sentence only where reasonable minds could not differ as to the excessiveness of the sentence." *Anderson*, 172 Idaho at 143, 530 P.3d at 690 (citation omitted). In imposing a sentence, the court is to consider: "(1) protection of society; (2) deterrence of the individual and the public generally; (3) the possibility of rehabilitation; and (4) punishment or retribution for wrongdoing." *Id.* (quoting *McIntosh*, 160 Idaho at 8, 368 P.3d at 628); *State v.*

26

*Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982). This Court applies the same standard when reviewing a reduced sentence under Rule 35. *State v. Lavy*, 121 Idaho 842, 845, 828 P.2d 871, 874 (1992).

In his Rule 35 motion, Frandsen argued that concurrent 25-year fixed sentences were a de facto life sentence because he was 54 years old at the time of sentencing and would not be eligible for parole until he is 79. He makes the same claim on appeal concerning his amended, 20-year fixed sentence, contending that such a sentence is unreasonable and tantamount to a fixed life sentence because he will not be eligible for parole until he turns 74.

In granting Frandsen's Rule 35 motion, the district court recognized that it acted within its broad discretion in ordering the original sentence of life with 25 years fixed. It stated that, while severe, "the ends of punishment, retribution and deterrence [were] served by this sentence, or one very similar in length." It further stated that: "Society and good order are protected by requiring [Frandsen] to complete the period of incarceration ordered by the [c]ourt, or a similar period of incarceration. Simply put, [Frandsen] was convicted of two (2) heinous offenses against children." It noted that Frandsen "failed to fully comply with the presentence investigation process in terms of providing the [c]ourt with a complete psychosexual evaluation."

In reviewing its sentence, the district court additionally observed that the sentence served the purpose of deterrence:

> [Frandsen]'s sentence is necessary and not unduly harsh or severe given the nature of his crime. The [c]ourt notes that the victims testified that he used terror to gain their compliance and the following years of their silence. The victims were his step-children at the time of his offenses. While their mother was not at home, he would terrorize the children in advance of his assaults by scratching on walls, hiding in the dark, and/or sexually assaulting them in the dark. He would sing a scary song in a creepy voice in advance of his assaults thereby announcing himself to them. Imposing the sentence, or one similar in length appears to be the better way to deter [Frandsen] and others from similar conduct.

The court also detailed the impact that Frandsen's crimes had on the victims, observing that one victim "at times has been suicidal, is unable to maintain healthy relationships and is apparently emotionally broken almost beyond repair. He feels worthless. The damage done by [Frandsen's] offense against him is likely permanent."

Ultimately, the court concluded that Frandsen's "Rule 35 motion falls short of new evidence and information." Despite this conclusion, the district court noted that it had "separately considered and reflected upon [Frandsen]'s request for leniency." It thus stated:

27

[Frandsen] is in apparent good health and if he remains healthy twenty-five years the [c]ourt's sentence does not necessarily equate to a fixed life sentence, but it may. [Frandsen] has offered an argument as to why the [c]ourt should consider leniency. When looking at his particular life expectancy, the length of the sentence is tantamount to fixed life as argued by [Frandsen]. The [c]ourt agrees with this argument because by taking judicial notice of the Social Security Administration's Actuarial Life Table, a 54 year old male has an average life expectancy of 25.06 years.

On appeal, Frandsen asserts that the district court did not go far enough by reducing the fixed portion of his sentence by only five years. Essentially, Frandsen challenges the district court's reliance on the Social Security Administration's Actuarial Life Table for the proposition that a 54-year-old male has an average life expectancy of 25 years. Frandsen states that "[t]he average life expectancy on the Social Security website does not necessarily have anything to do with Mr. Frandsen's life expectancy, or the length of his actual life." Thus, Frandsen asserts that "the district court needed to err on [his] side . . . and further reduce the fixed term."

Even though it granted Frandsen's Rule 35 motion, albeit to a smaller degree than Frandsen hoped, the district court noted that Frandsen failed to provide new evidence and information to warrant a reduction in sentence. It found that its original sentence was valid and fair. Nonetheless, the district court exercised its discretion and granted Frandsen some degree of leniency by shortening the fixed portion of his concurrent sentences by five years—a 20% reduction. Notably, Frandsen does not argue that the district court did not reach its decision by an exercise of reason; in fact, Frandsen actually agrees with the district court's reasoning. Instead, he simply asserts that the district court did not go far enough to avoid the possibility that he will spend most of his life in prison.

Frandsen compares his sentence to the one modified by this Court in *State v. Jackson*, 130 Idaho 293, 939 P.2d 1372 (1997). There, the district court sentenced the 48-year-old defendant to a fixed life sentence for one count of lewd conduct with a minor. *Id.* at 294, 939 P.2d at 1373. The defendant had abused his two stepdaughters, who were both under the age of 10. *Id.* at 293–94, 939 P.2d at 1372–73. This Court detailed the abuse as follows:

The first instances of abuse involved [the defendant] having the victims touch his penis, and escalated to the point where [the defendant] would have the victims sit on his penis and move back and forth. The victims were always dressed, and there was a blanket between [the defendant] and the victims. In addition, there were never any instances of penetration of any type, and [the defendant] made no threats of violence to his victims.

*Id.* at 293-94, 939 P.2d at 1372–73. The defendant also had one prior conviction for sexual abuse. *Id.* at 294, 939 P.2d at 1373.

On appeal, this Court found that a fixed life sentence was not appropriate and modified the sentence to an indeterminate life sentence with 15 years fixed. *Id.* at 296, 939 P.2d at 1375. Key to this decision was that the defendant "wishe[d] to undergo treatment and [would] cooperate in every way necessary. In addition, an evaluator indicated that the proper treatment could help prevent [the defendant] from re-offending." *Id.* at 295, 939 P.2d at 1374. He "indicated that he want[ed] to undergo treatment, [showed] a desire to change his behavior and exhibit[ed] a possibility for rehabilitation." *Id.* at 296, 939 P.2d at 1375.

Comparing the present case to *Jackson* is of no help to Frandsen. Indeed, merely demonstrating that another defendant received a lesser sentence for a similar crime under somewhat similar conditions is insufficient to show that the "sentence was excessive, considering any view of the facts." *McIntosh*, 160 Idaho at 8, 368 P.3d at 628. When a sentence falls "within the limits prescribed by the statute" this Court will not ordinarily find that the sentence is excessive. *Anderson*, 172 Idaho at 143, 530 P.3d at 690 (citation omitted). Sentencing is a matter that is squarely within the discretion of the district court. *Id.*

Moreover, the sentence in this case differs from *Jackson* because it does not concern a fixed life sentence; the fixed portion of Frandsen's concurrent sentences is 20 years. Thus, it does not implicate this Court's "unique" standard of review for fixed life cases. *See State v. Windom*, 150 Idaho 873, 878, 253 P.3d 310, 315 (2011) ("[A] fixed life term . . . should be regarded as a sentence requiring a high degree of certainty—certainty that the nature of the crime demands incarceration until the perpetrator dies in prison, or certainty that the perpetrator never, at any time in his life, could be safely released.") (alteration in original) (quoting *Jackson*, 130 Idaho at 294–95, 939 P.2d at 1373–74))).

Nevertheless, Frandsen argues that his sentence is "tantamount" to a "de facto life sentence." As support for this proposition, Frandsen cites to several cases where the Idaho Court of Appeals simply observed that certain sentences would likely result in the defendant spending the rest of his life in prison. *See State v. Li*, 131 Idaho 126, 952 P.2d 1262 (Ct. App. 1998) (noting that a 65-year sentence for a 26-year-old was akin to a fixed life sentence). Importantly, none of these cases suggest that Frandsen's sentence is tantamount to a life sentence and should be treated as such. Indeed, Frandsen fails to establish that this Court has ever considered whether a sentence

imposed on a nonjuvenile defendant is "tantamount" to a life sentence merely because the defendant was elderly or likely to spend most of his remaining life in prison. We decline to do so now.

In sum, Frandsen's abuse occurred over many years and was deliberately conducted in a manner that inflicted extreme terror and fear on his young victims. We conclude that the district court's description of these crimes as "heinous" was apt. The district court, after observing the defendant throughout his trial and sentencing, and considering the presentence reports and evidence offered at sentencing, ultimately considered the appropriate factors and imposed a stiff, but well-supported sentence. Because Frandsen "has failed to demonstrate that his sentence was unreasonable under any view of the facts," *Chavez*, 174 Idaho at 761, 560 P.3d at 504, we conclude that the sentence imposed by the district court was not an abuse of its discretion.

## III.  CONCLUSION

For the reasons set forth herein, we affirm the district court's judgment of conviction and uphold the amended sentences imposed following Frandsen's Idaho Criminal Rule 35 motion. Although the district court erred in admitting a portion of the text messages containing evidence of a prior bad act during the trial, and by allowing a lay witness to give some expert testimony, we conclude that these errors were harmless both individually and cumulatively.

Chief Justice BEVAN, Justices BRODY, ZAHN, and MEYER CONCUR.